IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Richard A. Crawford,                )   Civil Action No.:2:12-02795-RMG-BHH
                                    )
                    Petitioner,     )
                                    )   **REPORT AND RECOMMENDATION**
        v.                          )   **OF MAGISTRATE JUDGE**
                                    )
Michael McCall, *Warden*,           )
                                    )
                    Respondent.     )

        The Petitioner, a state prisoner, seeks habeas relief pursuant to 28 U.S.C. § 2254.

This matter is before the Court upon two motions: (a) Respondent's Motion for Summary

Judgment (Dkt. No. 17), and (b) Petitioner's Motion to Expand the Record (Dkt. No. 23).

        Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and

Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review the instant

petition for relief and submit findings and recommendations to the District Court.

        The Petitioner, proceeding *pro se*, filed the instant habeas action on September 24,

2012. (See Dkt. No. 1.) On November 30, 2012, Attorney Jeremy Adam Thompson filed a

Notice of Appearance on behalf of Petitioner, and also sought an extension of time within

which to amend the habeas petition. (See Dkt. No. 11; Dkt. No. 10.) Petitioner's request to

amend was granted, and on January 2, 2013, Petitioner, through counsel, filed an amended

petition. (See Dkt. No. 15.) On February 19, 2013, Respondent filed a Motion for Summary

Judgment. (Dkt. No. 17; see also Dkt. No. 16.) Petitioner filed his Response in Opposition

to the Motion for Summary Judgment on May 8, 2013. (Dkt. No. 22.) On May 10, 2013,

Petitioner filed a Motion to Expand the Record. (Dkt. No. 23.)

## PROCEDURAL HISTORY

        The Petitioner is currently confined at Lee Correctional Institution. In September of

2008, the Horry County Grand Jury indicted Petitioner for murder. (Dkt. No. 16-7.) Petitioner

was represented by W. Edward Chrisco, Esquire. (See R. at 1.) On September 8, 2009,

Petitioner pled guilty to voluntary manslaughter before the Honorable Edward B. Cottingham. (R. at 1-11.) On September 15, 2009, Judge Cottingham sentenced Petitioner to a period of confinement of thirty years. (R. at 12-36.) Petitioner did not file a direct appeal.

On or about February 10, 2010, Petitioner filed an application for post-conviction relief ("PCR"). (R. at 38-75.) Petitioner contended he was being held in custody unlawfully due to (verbatim):

(a) Ineffective assistance of counsel

(b) Bias and prejudice comments, demeanor, and intention of Judge

(c) Coercive nature of plea bargain.

(R. at 40.)

An evidentiary hearing was held on August 25, 2010, before the Honorable Larry B. Hyman, Jr. (R. at 79-139.) Petitioner was present and represented by Paul Archer, Esquire. (See R. at 79.) In an order dated October 12, 2010, Judge Hyman denied the application for post-conviction relief and dismissed the petition. (R. at 141-53.)

On March 21, 2011, Robert M. Pachak, Esquire, of the South Carolina Commission on Indigent Defense, filed a Johnson Petition for Writ of Certiorari. (Dkt. No. 16-1.) Therein, Petitioner raised the following issue: "Whether plea counsel was ineffective in giving petition incorrect sentencing advice?" (Dkt. No. 16-1 at 3 of 8.) Counsel also filed a petition to be relieved as counsel. (Id. at 7 of 8.) In accordance with the Johnson procedure, Petitioner filed a *pro se* brief, wherein he raised the following issues:

1) Whether plea counsel was ineffective in giving petitioner incorrect sentencing advice?

2) Whether plea counsel was ineffective in that he conspired unjustly with the state to obtain a guilty plea.

3) Whether plea judge was bias and prejudice in his judgment on sentencing.

(Dkt. No. 16-2 at 2 of 11.)

2

In an order dated May 23, 2012, the Supreme Court of South Carolina entered an order denying the petition for writ of certiorari, and granting counsel's request to withdraw. (Dkt. No. 16-3.) The matter was remitted to the lower court on June 12, 2012. (Dkt. No. 16-4.)

The Petitioner, then proceeding *pro se*, filed the instant habeas petition wherein he raised the following ground for review (verbatim):

> **Ground One**: Ineffective assistance of counsel failure to properly advise.
> **Supporting Facts**: I argue that my trial counsel gave me bad advice to plead guilty . . . when counsel had enough evidence to go to trial. Because my co-defendant statement was compromised . . . and the other state witness is same girl in video seen taking something off the body. . . . As such there is no concrete proof other than these two showing I was at fault in this killing and evidence shows a struggle for the gun. Furthermore, according to one state witness statement that when victim saw me said "You coming to get some more" and this is evidence trial counsel overlooked. . . .

(Dkt. No. 1.) Thereafter, on November 30, 2012, Attorney Jeremy Adam Thompson filed a Notice of Appearance on behalf of Petitioner. (Dkt. No. 11.) After receiving an extension of time, Petitioner filed an amended habeas petition, wherein he raised the additional ground for review:

> **Ground Two**: Defense counsel was ineffective, in violation of the Petitioner's rights under the Sixth and Fourteenth Amendments to the United States Constitution, for failing to advise the Petitioner that he would be eligible for a charge on involuntary manslaughter if he proceeded to trial.
> **Supporting Facts**: The Petitioner described the incident with the decedent as one where the decedent had a firearm on his person that the Petitioner attempted to grab. There was then a struggle over the gun and the gun was discharged, ultimately killing the decedent. On these facts, the Petitioner was entitled to a charge on involuntary manslaughter if he proceeded to trial. Defense counsel was ineffective for failing to advise the Petitioner that the jury could find him guilty of involuntary manslaughter if he proceeded to trial.

(Dkt. No. 15.)

At approximately the same time he filed the instant habeas petition, Petitioner filed a second PCR application. (Dkt. No. 16-8.) The following question and answer appeared on that *pro se* application:

3

16. If any ground set forth in (10) has not previously been presented to any Court, State or Federal, set forth the ground and state concisely the reasons why such ground has not previously been presented:

(a) Ineffective assistance of PCR counsel failure to do so <u>Martinez v. Ryan</u>

(Dkt. No. 16-8 at 4 of 7.) On December 7, 2012, the Honorable Steven H. John signed a Conditional Order of Dismissal. (Dkt. No. 16-10.) At the time Respondent filed the Motion for Summary Judgment, a final order had not been filed.

## APPLICABLE LAW

### Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." <u>The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth</u>., 597 F.3d 570, 576 (4th Cir. 2010) (citing <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" <u>Id</u>. (quoting <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999)); <u>see also Perini Corp. v. Perini Constr., Inc.</u>, 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

Respondent moved for summary judgment on both grounds. (<u>See</u> Dkt. No. 16.) In Petitioner's Response in Opposition, Petitioner withdrew Ground One and elected to proceed solely on Ground Two. (Dkt. No. 22 at 4 of 23.) As such, the only ground for relief presently before the Court is Petitioner's claim that his plea counsel was constitutionally ineffective "for failing to advise Petitioner that he would be eligible for a charge on involuntary manslaughter if he proceeded to trial." (<u>See</u> Dkt. No. 22 at 4 of 23.)

4

Petitioner admits that Ground Two was defaulted in state court. (See Dkt. No. 22 at 6 of 23.) Petitioner argues, however, that the Court should consider Ground Two in light of the Supreme Court's decision in Martinez v. Ryan, 132 S. Ct. 1309 (2012). (Dkt. No. 22 at 6.)

"Federal habeas review of a state prisoner's claims that are procedurally defaulted under independent and adequate state procedural rules is barred unless the prisoner can show cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or prove that failure to consider the claims will result in a fundamental miscarriage of justice." Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008) (quoting McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000)); see also Coleman v. Thompson, 501 U.S. 722, 750 (1991).[1]  Pursuant to Martinez v. Ryan, 132 S. Ct. 1309, 1315 (2012), "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." However, "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Martinez, 132 S. Ct. at 1318 (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)); see also Trevino v. Thaler, 133 S. Ct. 1911, 1918 (2013). If the ineffective assistance of trial counsel claim "does not have any merit or . . . is wholly without factual support," the procedural default precludes federal habeas review. Martinez, 132 S. Ct. at 1319.

It is clear from a review of the record that while Petitioner's PCR counsel did raise certain claims of ineffective assistance of counsel, PCR counsel did not raise the allegation that plea counsel was ineffective for failing to advise the Petitioner that he would be eligible for a charge on involuntary manslaughter if he proceeded to trial. Certainly PCR counsel's

---

[1]In the alternative for showing cause and prejudice, a petitioner must demonstrate a miscarriage of justice, e.g., actual innocence. Bousley v. United States, 523 U.S. 614, 623 (1998). Petitioner has not shown–or even argued–that he is actually innocent of the at-issue crimes. Schlup v. Delo, 513 U.S. 298, 327 (1995).

representation of Crawford is markedly different from the representation provided to the petitioner in <u>Martinez</u>, as the PCR attorney in <u>Martinez</u> "filed a statement that, after reviewing the case, [counsel] found no meritorious claims helpful to the petitioner." <u>Martinez</u>, 132 S. Ct. at 1313. For purposes of this Report and Recommendation, however, the undersigned will assume–without deciding–that Petitioner can show his PCR counsel's performance was deficient.

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984), states that a meritorious ineffective assistance of counsel claim must demonstrate two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. <u>Id</u>. at 687–96.  A court's evaluation of counsel's performance under this standard must be "highly deferential," so as to not "second-guess" the performance.   <u>Id</u>. at 689.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  <u>Id</u>. (internal quotation marks and citation omitted); <u>see also Bowie v. Branker</u>, 512 F.3d 112, 119 n.8 (4th Cir. 2008); <u>Fields v. Att'y Gen. of Md.</u>, 956 F.2d 1290, 1297–99 (4th Cir. 1992); <u>Roach v. Martin</u>, 757 F.2d 1463, 1467 (4th Cir. 1985).  In order to establish the second prong of Strickland, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  A "reasonable probability" has been defined as "a probability sufficient to undermine confidence in the outcome." <u>Id</u>.

The two-part test enunciated in <u>Strickland</u> applies to challenges to guilty pleas based on ineffective assistance of counsel. <u>See Hill v. Lockhart</u>, 474 U.S. 52, 58 (1985). "[I]n order to satisfy the 'prejudice' requirement [set forth in <u>Strickland</u>], the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill</u>, 474 U.S. at 59.

Petitioner recognizes that "although the PCR court did not address the involuntary

6

manslaughter claim on the merits, and thus there is no decision to give deference to pursuant to 28 U.S.C. § 2254(d), the PCR court did make findings regarding the credibility of the Petitioner and defense counsel." (Dkt. No. 22 at 12-13 of 23.) As stated in § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Wilson v. Ozmint, 352 F.3d 847, 858 (4th Cir. 2003).

In order to fully assess Petitioner's claim that he rebutted the presumption of correctness of the PCR court's factual findings by clear and convincing evidence, the undersigned will first examine the testimony at the PCR hearing and then the PCR judge's order.

At the PCR hearing, Petitioner testified that he was "coached" by his counsel to plead guilty and that his counsel and "manipulated [him] through . . . psychological coercion." (R. at 90-91.) Petitioner testified that, about five or six months prior to the shooting, the decedent shot Petitioner in the leg with "a[n] AK rifle." (R. at 94.) Petitioner testified that he did not go to the hospital because he did not "want to compromise [his] job." (R. at 94.) Petitioner testified that when he saw the decedent at the gas station, he was in fear. (R. at 95.) Petitioner further testified that he reviewed a copy of the tape showing the shooting with his plea counsel, and that he reviewed it again the morning of the PCR hearing. (R. at 97.) Petitioner testified as follows:

> The tape shows–it shows me pulling up to the convenience store, and I was talking–talking to my brother, and he was in another car. He was in the car beside me. I pulled up beside him, and I backed out to let another car out, and I stopped and talked to him. He told me that the man that shot me was inside the store.
> I had my wife in the car with me at the time, and it was our anniversary. We was on our way out of town.
> So, I–I–after he told me that, I said–well, I figured I was going to handle this instead of running around scared all the time.
> So, I go drop my wife off at my momma house. My momma stay about two minutes away from the store.

> My intentions was to go back to the store and maybe, maybe fight the
> dude or whatever but when I ran up on him, and he tried to pull–okay.
> Well, I pulled back up to the store. He was walking out of the door, and as
> I'm–as he was walking out of the door–as he was walking out of the door, I
> pulled up in front of pump 4 at the– . . .
> . . . .
> And then, well, words passed, and then he was walking to his car, and he
> tried to throw his chicken–he tried–he had a box of chicken. He tried to put
> that on top of the car but then as he was turning he tried to reach–reach for
> his gun. He had a gun in his waist. He had a shirt that flowed. He tried to
> reach, and when I rushed him–when I rushed him, I felt the butt of the gun.
> When I rushed him, the gun went off. . . .

(R. at 98-99.) When asked why police did not find a gun on the decedent, Petitioner stated,

> It's also on camera that the girl from pump 4 which is also a State witness is
> taking something off the body and running to her car. That's also on the tape.
> So, I–what I say is that that had to be the weapon . . . .

(R. at 101.) When asked about the lack of powder burns on the decedent, Petitioner testified

as follows:

> The tape–the tape shows that I was right up on the victim. Therefore, and the
> gun–the gun was tangled up inside of the victim's–inside the victim's shirt.
> Therefore, there was cloth in between the projectile. There's cloth between
> the projectile and the skin. The–the gunpowder wouldn't be on the body. It
> would be on the shirt, and, therefore, and then the gun–and when they had
> the shirt, the bullet was in between the shirt and the skin, the gunpowder
> would be on the shirt.

(R. at 104.)

Ed Chrisco, Petitioner's plea counsel, also testified at the PCR hearing. Chrisco

stated that he met with Petitioner "many times." (R. at 119.) Chrisco testified that Petitioner's

version of the events changed over the course of his representation of Petitioner. (R. at 119-

20.) The following exchange occurred at the PCR hearing:

> Q. What–what–what was the first version of events he told you, if you recall?

> A. Ah, the first one was that when he drove up that the person had a gun and
> that there was another couple of guys that were standing in front of the
> automobile–the victim's automobile, and it wasn't his shot, and it couldn't have

been his shot from the angle of the way that the bullets were fired. It had to be from the people, ah, that were standing in front of him.

Ah, my investigator talked with the person that was pumping the gas, and, ah, they stated that there could have been a car in front but they didn't see the car. Their attention was to where the shooting was taking place.

When we got the video, there was never any people or cars that were out in front.

He states today that he did not have the gun and it must have been the gun that the guy had, ah, that was–that he was shot with.

Q. Is that inconsistent with what he told you?

A. Well, it's inconsistent with what he told the police because when he was arrested, ah, he was arrested that day. He ran–he went back home and then ran out in the woods. He told them that he hid it under a piece of plywood and took them to where it was, and it wasn't there anymore. . . .

. . . .

Going back to another version of it, he said that when he was shot, he told me that when he was shot by the victim in the case that he went to the Loris Hospital.

My investigator goes there. Spends a lot of time typing up all the necessary documents to get all the–and get and then having him to sign medical release forms, and they search and they can't find him.

So, we talk with him again. He tells us approximate dates of who he talked with, and then my investigator goes back over there and spends at least another day trying to sift through, ah, only to find out that he never went to the hospital.

So, there was a lot of investigation on our part that was just wasted because of the different versions that was coming along.

(R. at 120-21.)

Chrisco testified that he reviewed the witness statements, and that Petitioner told Chrisco the witnesses could not have seen the shooting because there was a pickup truck parked at pump five. (R. at 122.) Chrisco opined that the video did not support Petitioner's description of the blocked view: "Well, there was when he drove up but as he was driving up, that vehicle was backing out and was leaving. So, at the time the shots were fired, ah, there would have been a clear view." (R. at 122.) Chrisco described another witness statement as follows:

> [T]he most damning was his half-brother, I think his last name was Rouse. He's the one that gave the statement to police shortly after this happened that, yes, he was riding with him. Yes, he had told–he had gone and told him that the guy was up at the . . . convenience store.
>
> In fact, right at the start of the video, it shows–the video, the security camera shows him talking with his brother side by side in a car, a clear view of him, ah, and it also shows the victim's car is sitting there.
>
> So, ah, when he returned, then there–the, ah, the brother is in the car with–with–with him at that time could imply to a jury that he had gone home because he lived not far from there. Ah, dropped that person off. Got a weapon and came back. So, it was more of a premeditation insinuation there.

(R. at 122-23.) The co-defendant "says that . . . the gun was in the console and that when [Petitioner] got out of the car, he had the gun in his hand." (R. at 123.) When asked whether there were any witnesses who would testify that the victim was not armed, Chrisco stated that "[t]here was [sic] witnesses said they didn't see–see that he had–had a gun." (R. at 124.)

When asked what defenses Petitioner discussed with Chrisco, stated,

> He said that he had a gun, and I said, "Well, I don't see how we can–how we can say that he's got a gun and it would be up to a jury to believe whether he had a gun or not."
>
> I said, "We have nothing that would indicate that he had a gun."
>
> Can't see a gun. So, you've got to convince a jury is what they see a gun, and I told him that I was at a loss to describe that he had a gun when there was nothing to indicate that he had a gun.

(R. at 125-26.) The following exchange also occurred:

> Q. Did Mr. Crawford–the version of events that you heard today in his testimony, did–did he tell you that version of event, that–that it got caught up in the victim's clothing?
>
> A. He never said that it got wadded up and they tussled and it was there. When–when I represented him, it was always that he had the gun.
>
> Q. He being?
>
> A. Mr. Crawford.
>
> Q. Okay.

> A. He always had a gun but the victim had a gun but it was taken off of–of him later, and the problem today that I've got with what he's saying that the female that took something off of him six or seven minutes after he was shot was the gun. . . .

(R. at 126.)

When asked whether he entered into plea negotiations with the State, Chrisco stated that he asked Petitioner if Petitioner wanted Chrisco to see what kind of plea offer the State would make. (R. at 128.) Chrisco testified as follows:

> The State in a murder case rarely ever makes a plea offer if the evidence is–is pretty good, and I tell you that the video tape was pretty good.
> So, I talked with Ms. Elder who had been assigned the case, and I asked her could we–would she entertain him pleading to manslaughter, and after the initial shock and laughter had subsided, she said, no, that it was on video and that she was going to try the case.
> And I explained to her that there had been prior trouble between he and the victim, that he was shot before, ah, and that's the reason for the bad blood, ah, and that, you know, that we would bring that out during the trial, too, to let the jury know that–that, ah, there was–there was, yes, he had shot but there was a reason, and, hopefully, they would take it in the manner in which we were going to do it.
> Ah, and after several discussions, she sent a plea offer of, ah, manslaughter and said she would recommend, the State would recommend twenty-five to thirty years.

(R. at 128.) When asked whether he felt that the plea was in Petitioner's best interest, Chrisco stated, "I told him my advice would be to accept the offer that the State had extended to him because with the video tape it was going to be very hard to convince a jury that he was not guilty of the murder." (R. at 131.)

As noted above, Judge Hyman signed an order denying Petitioner's application for post-conviction relief on October 12, 2010. (R. at 141-53.) That order stated, *inter alia*,

> At the PCR hearing, this Court had before it the Applicant's PCR file, the records of the Horry County Clerk of Court regarding the conviction, the Applicant's records from the South Carolina Department of Corrections, and the guilty plea transcript. By agreement, the parties also submitted a DVD of the shooting for the Court's review prior to the hearing. . . . This Court carefully listened to the testimony presented at the hearing and weighed the

11

same according to credibility. This Court **did not find the Applicant's testimony to be credible on the key issues in this case, including his testimony describing the shooting** and his testimony regarding the voluntariness of his plea. Mr. Chrisco's testimony was highly credible.

. . . .

[T]he Applicant failed to prove that counsel's performance fell below reasonable professional norms. **This Court finds that the version of the events described by the Applicant at the PCR hearing was not consistent with what the Applicant told counsel prior to the plea, and was not consistent with the evidence including what was depicted on the videotape of the shooting. It was also not consistent with what the Applicant told the judge at the guilty plea–at the plea, the Applicant admitted he had a 9 millimeter gun when he got out of the car, and he told the judge he "wanted to scare him (the victim) or something."** In this Court's view, the evidence against the Applicant was overwhelming. Thus, counsel's advice to the Applicant to plead to a lesser offense that did not subject him to life imprisonment was abundantly reasonable.

I addition, this Court finds no credible evidence that the Applicant's plea was involuntary or unknowing. After being fully advised of the plea offer, the evidence against him, his rights, and the consequences of a guilty plea, the Applicant made a free and informed decision to plead guilty. He made a decision that he believed to be in his best interests under the circumstances. He was fully aware that the judge could give him up to thirty years, and that he would be serving 85% of any sentence. The plea record establishes that the Applicant knew what he was doing when he pled guilty and that he was not coerced or improperly influenced. This Court does not believe that counsel improperly manipulated the Applicant by any means, or that he conspired with the prosecutor against the Applicant's interests. In sum, this Court finds that the Applicant failed to present persuasive or credible reasons why he should be allowed to depart from the truth of the statements he made at the guilty plea.

(R. at 149-50 (emphasis added).)

In his Response in Opposition, Petitioner contends "the new evidence submitted to this Court pursuant to Martinez meets" the high standard set forth in § 2254(e)(1), such that "this Court should reject the credibility findings of the PCR court." (Dkt. No. 22 at 13.) Petitioner contends that, at the PCR hearing, "defense counsel made overarching statements about his representation that simply are not true in light of the contents of his file." (Dkt. No. 22 at 13.) In arguing he can meet the "clear and convincing" standard set forth in § 2254(e)(1), Petitioner highlights three areas of defense counsel's testimony at the

PCR hearing. First, Petitioner points to Chrisco's testimony that he met with Petitioner "many times" after Petitioner made bond, (R. at 119), and contends that Chrisco's file "reflects that the only meetings that were documented in the file by defense counsel (whose initials are 'EC') occurred while the Petitioner was housed at the Horry County Detention Center." (Dkt. No. 22 at 13; see also Dkt. No. 22-1.)[2] Of course, Chrisco's case notes do not–on their face–appear complete, as there is also no indication of a plea or sentencing, (Dkt. No. 22-1), and Petitioner himself testified at the PCR hearing to a meeting with Chrisco, after Petitioner bonded out, that does not appear to be noted in Chrisco's file.[3]

_____

[2]Petitioner filed a Motion to Expand the Record (Dkt. No. 23) to include these new documents. Respondent did not file a Response in Opposition to this motion. In Fielder v. Stevenson, No. 2:12-cv-412-JMC, 2013 WL 593657 (D.S.C. Feb. 14, 2013), Judge Childs thoroughly examined a similar issue. As noted in her order, Rule 7 of the Rules Governing Section 2254 Cases "authorizes a federal habeas court to expand the record to include additional material relevant to the petition in some situations." Fielder, 2013 WL 593657, at *2. She noted that although § 2254(e)(2) "sets limits on a petitioner's ability to expand the record in a federal habeas proceeding, . . . . courts have held that § 2254(e)(2) does not . . . constrain the court's discretion to expand the record to establish cause and prejudice to excuse a petitioner's procedural defaults." Id. at *3 (citing Cristin v. Brennan, 281 F.3d 404, 416 (3d Cir. 2002); Buckman v. Hall, 2009 WL 204403 (D. Or. Jan. 23, 2009)). Judge Childs stated,

> [T]he court retains its discretion to expand the record to allow a petitioner to establish cause and prejudice to excuse a petitioner's procedural defaults. See Cristin, 281 F.3d at 414 (3d Cir.2002). In determining whether to expand the record, a federal court must consider whether doing so "would enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." See Schriro v. Landrigan, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) (discussing evidentiary hearings under § 2254).

Fielder, 2013 WL 593657, at *3. Although, for the reasons set forth herein, this "expanded" evidence does not entitle Petitioner to habeas relief, the undersigned recommends allowing the expansion in order to evaluate cause and prejudice for the default. The undersigned therefore recommends that the Motion to Expand the Record (Dkt. No. 23) be granted. See Quintero v. Bell, No. 3:09-cv-00106, 2012 WL 6188468, at *4 (M.D. Tenn. Dec. 12, 2012) (allowing expansion of the record to evaluate cause and prejudice for default but reserving right to exclude consideration of evidence on the merits).

[3]Chrisco's file indicates that Petitioner bonded out on or about January 28, 2009. (Dkt. No. 22-1 at 2 of 3.) Petitioner testified that, after he bonded out, Chrisco "took [Petitioner] into a jury selection . . . just to show me that it was like a hundred in something people in there . . . ." (R. at 91.) Petitioner also testified that Chrisco showed the tape to Petitioner, (R. at 97), though Chrisco's file does not reflect as much. In short, it is clear the document submitted by Petitioner does not completely capture every action taken by Chrisco on behalf of Petitioner.

Chrisco's case notes do not constitute clear and convincing evidence sufficient to rebut the presumption of correctness afforded the PCR court's credibility determinations.

Petitioner next points to Chrisco's testimony that Petitioner told Chrisco that when the victim previously shot Petitioner, Petitioner went to Loris Hospital, and Chrisco's testimony that the investigator "wasted time" pursuing information that was not true. (Dkt. No. 22 at 13-14.) Petitioner states, "[D]efense counsel's file reveals that not only did they receive records from Loris Hospital, though not regarding this shooting, the records were not printed until September 2, 2009, a mere six days before Petitioner's guilty plea." (Id. at 14; see also Dkt. No. 22-2.) Contrary to Petitioner's assertion, this evidence is not sufficient to rebut the presumption of correctness afforded to the PCR court's credibility determinations. As Petitioner acknowledges, the documents obtained by Loris Hospital are not records from a shooting. (See Dkt. No. 22-2.) Rather, they are records relating to a motor vehicle accident. (Id.) That the record was printed on September 2, 2009, does not constitute clear and convincing evidence sufficient to rebut the PCR court's factual finding that Petitioner's description of the shooting was not credible. Moreover, these records do not constitute clear and convincing evidence that finding Chrisco to be credible was erroneous, as these records do not cast doubt upon Chrisco's testimony that Petitioner told him Petitioner sought treatment at Loris Hospital after the victim shot the Petitioner. Instead, the record seems to support the PCR court's credibility finding, as it appears Chrisco attempted–as he testified–to obtain Petitioner's records from Loris Hospital.

Finally, Petitioner points to defense counsel's testimony that plea negotiations did not "begin until he requested a plea offer from the State" and defense counsel's testimony regarding the prosecutor's "surprised reaction to [counsel's] request for a plea." (Dkt. No. 22 at 14.) Petitioner presented a letter dated October 9, 2008, from Chrisco to Petitioner; attached to the letter was a plea offer from the solicitor. (See Dkt. No. 22-3.) The plea offer,

which was dated October 9, 2008, indicated that if the Petitioner pled guilty to voluntary manslaughter, the State would offer 25 years. (See Dkt. No. 22-3 at 2 of 2.) The letter indicated the plea offer expired on October 31, 2008. (Id.) Petitioner states,

> [I]t is extremely unlikely that the State had the reaction described by defense counsel, as the State had made a similar offer prior to defense counsel's request for a plea to voluntary manslaughter. The plea negotiations had clearly begun much earlier, and were much less hostile, than defense counsel's testimony led the PCR court to believe.

(Dkt. No. 22 at 14 of 23.) Petitioner also asserts that defense counsel "unmistakably mishandled the first plea offer," as defense counsel mailed the plea offer to Petitioner at his home address, even though Petitioner was still incarcerated at the Horry County Detention Center. (Id. at 15.) While Petitioner "does not assert that he would have taken this plea offer had he been advised of it earlier, the Petitioner believes that defense counsel's unquestioned deficient conduct with regard to this dimension of the representation lends credence to his argument that defense counsel was deficient in other respects in this case." (Id.)

It appears plea negotiations were not exactly as counsel described at the PCR hearing. However, this evidence simply does not constitute clear and convincing evidence sufficient to rebut the PCR court's conclusion that Petitioner's testimony describing the shooting was not credible. (See R. at 149.) As noted above, the PCR judge made a very specific factual finding regarding the events at the gas station. (R. at 149-50.) The PCR judge found that Petitioner's version of the events at the gas station was not credible because that version was not consistent with (a) what Petitioner told counsel prior to the plea, (b) the depiction of the shooting on the videotape, (c) the Petitioner's statement at his guilty plea wherein Petitioner admitted he had a 9 millimeter gun when he got out of the car, and (d) Petitioner's statement at his guilty plea that he wanted to scare the victim. (R. at 149-50.)

15

Certainly the PCR judge had evidence before him sufficient to support his finding that Petitioner's testimony describing the shooting was not credible. In addition to the testimony at the PCR hearing, the PCR judge reviewed the transcript of the plea and sentencing hearings and watched the video that captured the shooting. While Petitioner claimed at the PCR hearing that he did not have a gun, Petitioner admitted at his plea hearing to having a 9 millimeter. (See R. at 8-9.) The following exchange occurred at Petitioner's plea hearing:

THE COURT: Are you guilty of willfully and intentionally killing and shooting one Edward McAllister?

MR. RICHARD ALAN CRAWFORD: Yes, sir, I am.

THE COURT: What kind of weapon did you have?

MR. RICHARD ALAN CRAWFORD: 9 millimeter.

THE COURT: How many times did you shoot him?

MR. RICHARD ALAN CRAWFORD: Once.

. . . .

THE COURT: In pleading guilty you are giving up any defenses that you might have for either self-defense or accident or whatever. Do you understand that? You are giving up any defenses that you have. You can't come in and later plead self-defense or accident or whatever it–you may be.

MR. RICHARD ALAN CRAWFORD: Yes, sir.

THE COURT: Do you fully understand that?

MR. RICHARD ALAN CRAWFORD: Yes, sir.

. . . .

THE COURT: Mr. McAllister (sic), are you guilty?

MR. RICHARD ALAN CRAWFORD: Yes, sir.

THE COURT: Did you shoot him with a 9 millimeter?

MR. RICHARD ALAN CRAWFORD: Yes, sir.

16

(R. at 8-11.) At Petitioner's sentencing hearing, the following exchange occurred:

> THE COURT: Well, why did you get out the car with the gun?
>
> MR. RICHARD ALAN CRAWFORD: I wanted to scare him or something. It–my intentions wasn't to kill him til–til I noticed he had a gun, and he knowed that he the type that would–I mean–Your Honor, them young boys, they don't have no value for human life at all. They just running around shooting people and doing whatever they want to do, and–and I–I just rather not be a victim to it. I mean, them young boys do not care about–about life at all. I mean, and me being the family man that I am, I–I just can't–can't see myself leave–leaving him like that.

(R. at 30.)

The undersigned has, like the PCR judge, viewed the videotape of the incident. While the camera is too far away from the gas pumps to conclusively eliminate the possibility that the victim had a gun, the video likewise does not eliminate the possibility that the Petitioner was armed when he got out of his car and approached the victim. What the video does clearly show, however, is Petitioner, while in his vehicle, stop to talk to someone in another vehicle. Petitioner backs up slowly, then puts the car back in drive and drives away. Petitioner's vehicle can be seen entering the highway. A few minutes later, the victim is seen walking out of the gas station and back towards the victim's vehicle, which is parked at the far right gas pump. Petitioner quickly pulls his vehicle up to where the victim is walking and hops out. The victim continues to slowly walk away, back towards the victim's car; the Petitioner follows the victim. After Petitioner rounds the gas pump, the victim starts towards Petitioner but then turns and attempts to run away. Petitioner chases the victim. The victim falls to the ground. Petitioner jumps around, goes back to his vehicle, and then leaves the scene.

On all this evidence before the PCR judge, Petitioner is not able to meet the "clear and convincing evidence" standard sufficient to rebut the PCR judge's finding that Petitioner's testimony describing the shooting was not credible. See Cagle v. Branker, 520

F.3d 320, 324 (4th Cir. 2008) ("[F]or a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."); Fisher v. Lee, 215 F.3d 438, 446 (4th Cir. 2000) ("Fisher has not shown that the state court findings are unreasonable, unsupported, or otherwise erroneous. Indeed, they are supported by competent evidence."); Haynes v. Warden of McCormick Corr. Inst., No. 2:09-1377-JFA-RSC, 2010 WL 503098, at *5 (D.S.C. Feb. 8, 2010) (finding a claim of ineffective assistance to be without merit where the "PCR judge's findings are well supported by the record and petitioner fails to show by clear and convincing evidence that the PCR court made an unreasonable determination of the facts . . . "); cf. Wilson v. Ozmint, 352 F.3d 847, 860 (4th Cir. 2003) ("These facts do not compel the credibility determination reached by the state court, but they certainly provide sufficient basis, for purposes of section 2254(d)(2), to support such a determination.").

With all of the aforementioned analysis in mind, the undersigned returns to the question of whether Petitioner meets the exception set forth in Martinez. In order for this Court to excuse the procedural default, Petitioner must show, *inter alia*, "'no counsel' or only 'ineffective' counsel during the state collateral review proceeding." Trevino v. Thaler, 133 S. Ct. 1911, 1918 (2013). Petitioner cannot show that his PCR counsel was ineffective because, even assuming deficient performance, Petitioner cannot show prejudice with respect to PCR counsel's failure to raise the claim that plea counsel was ineffective for failing to advise the Petitioner that he would be eligible for a charge on involuntary manslaughter if he proceeded to trial. See Foley v. White, No. 6:00-cv-552-DCR-REW, 2012 WL 6965070, at 11 (E.D. Ky. Nov. 15, 2012), adopted at 2013 WL 375185 (E.D. Ky. Jan. 30, 2013) (" Even if the Court assumes that post-conviction counsel's performance was deficient, for all the reasons stated in Judge Johnson's recommendation, Foley cannot show prejudice. In particular, he cannot show that, but for post-conviction counsel's errors, there

18

is a reasonable probability he would have received relief on his ineffective-assistance-of-trial

counsel claim."); see also Leavitt v. Arave, No. 1:93-cv-0024-BLW, 2012 WL 1995091, at

*10 (D. Idaho June 1, 2012).

Furthermore, in light of the PCR judge's factual findings, the underlying ineffective

assistance claim is not "substantial" because it "is wholly without factual support." Martinez,

132 S. Ct. at 1319. As explained in detail above, the PCR judge did not credit Petitioner's

version of the events. Involuntary manslaughter is "(1) the unintentional killing of another

without malice, but while engaged in an unlawful activity not naturally tending to cause death

or great bodily harm; or (2) the unintentional killing of another without malice, while engaged

in a lawful activity with reckless disregard for the safety of others." Douglas v. State, 332

S.C. 67, 74, 504 S.E.2d 307, 310 (1998). As Respondent notes in his Memorandum in

Support of the Motion for Summary Judgment, Petitioner's actions do not fit into either of

those two categories. Petitioner was not engaged in a lawful activity with reckless disregard

for the safety of others, as he was unlawfully possessing the 9 millimeter at the time of the

shooting due to the fact that he was a felon. (See Dkt. No. 16 at 24; see also R. at 17-18.)

Nor was Petitioner engaged in an unlawful activity not naturally tending to cause death or

great bodily harm. In fact, Petitioner testified at his sentencing hearing that he "wanted to

scare" the victim and that "[i]t–my intentions wasn't to kill him til–til I noticed he had a gun

. . . ." (R. at 30.) "[I]nvoluntary manslaughter is at its core an unintentional killing." Douglas,

332 S.C. at 74, 504 S.E.2d at 310. On the facts as found by the PCR court, the claim that

plea counsel was ineffective for failing to advise Petitioner that he would be eligible for a

charge on involuntary manslaughter if he proceeded to trial is not substantial. See Douglas,

332 S.C. at 74, 504 S.E.2d at 310 ("[W]here a defendant intentionally arms himself and

shoots into a crowd, . . . he is not entitled to an involuntary manslaughter charge."). For the

reasons set forth above, Petitioner has not established cause and prejudice such that the

procedural bar should be lifted. The undersigned therefore recommends granting Respondent's Motion for Summary Judgment. (Dkt. No. 17.)

## CONCLUSION

It is therefore RECOMMENDED, for the foregoing reasons, that Petitioner's Motion to Expand Record (Dkt. No. 23) be GRANTED. It is further RECOMMENDED that Respondent's Motion for Summary Judgment (Dkt. No. 17) be GRANTED; and the Petitioner's habeas petition be DISMISSED WITH PREJUDICE. The undersigned also RECOMMENDS that a certificate of appealability be DENIED.[4]

IT IS SO RECOMMENDED.

s/Bruce Howe Hendricks
United States Magistrate Judge

July 11, 2013
Charleston, South Carolina

**The Petitioner's attention is directed to the important notice on the next page.**

---

[4] Title 28, Section 2253 provides in relevant part,
(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.
28 U.S.C. § 2253. A prisoner satisfies this standard by demonstrating that reasonable jurists would find this court's assessment of his constitutional claims debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. See Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000); Rose v. Lee, 252 F.3d 676, 683 (4th Cir. 2001). In the case *sub judice*, the legal standard for a certificate of appealability has not been met. The undersigned therefore recommends that a certificate of appealability be denied.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).